[No. S089733. Aug. 13, 2001.]

In re RANDY G., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
RANDY G., Defendant and Appellant.

558

**COUNSEL**

Robert S. Gerstein, under appointment by the Supreme Court; and Michele A. Douglass, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark D. Rosenbaum for American Civil Liberties Union as Amicus Curiae on behalf of Defendant and Appellant.

John T. Philipsborn for California Attorneys for Criminal Justice as Amicus Curiae on behalf of Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, William T. Harter, Joana Perez Castille, Donald E. De Nicola and Richard S. Moskowitz, Deputy Attorneys General, for Plaintiff and Respondent.

Parker & Covert, Spencer E. Covert and Barbara J. Ginsberg for California School Boards Association's Education Legal Alliance and California Association of Supervisors of Child Welfare and Attendance as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**BAXTER, J.**—In this case we are asked to determine whether school officials may detain a minor student on school grounds in the absence of reasonable suspicion of criminal activity or violation of a school rule. The minor, Randy G., contends that when school security officers called him out of class into the hallway, he was detained without cause in violation of his rights under the Fourth Amendment to the United States Constitution. The Court of Appeal, relying on *In re Frederick B.* (1987) 192 Cal.App.3d 79 [237 Cal.Rptr. 338], applied the reasonable-suspicion standard to this encounter, which occurred on school grounds and during school hours, and found that it had been satisfied. We do not decide whether the record supports that finding of reasonable suspicion because we conclude instead that the broad authority of school administrators over student behavior, school safety, and the learning environment requires that school officials have the power to stop a minor student in order to ask questions or conduct an investigation even in the absence of reasonable suspicion, so long as such authority is not exercised in an arbitrary, capricious, or harassing manner. On this ground, we affirm the Court of Appeal.

I

### BACKGROUND

A petition filed pursuant to Welfare and Institutions Code section 602 alleged that the 14-year-old minor had violated Penal Code section 626.10,

subdivision (a) by possessing a knife with a locking blade on school grounds. Prior to the jurisdictional hearing, the minor moved to suppress evidence of the knife, asserting that its discovery during a consent search had been tainted by the preceding illegal detention in violation of the Fourth Amendment. Moving him from the classroom into the hallway for questioning was, he claimed, an unreasonable detention because there was no articulable basis for a reasonable suspicion that he had engaged or was engaging in the proscribed activity, i.e., violation of a criminal statute or school rule. The motion was denied, after which the petition was sustained. The minor was declared a ward of the court and placed on probation.

The evidence offered at the hearing on the motion to suppress reflects the following:

Cathy Worthy, a campus security officer at the public high school attended by the minor, testified that during "passing time,"[1] approximately 9:00 a.m. on March 16, 1999, she was between "C building and A auditorium." As she came around one of two large pillars in that area, she observed the minor and a friend in an area of the campus in which students are not permitted to congregate. When the minor saw Worthy, he "fixed his pocket very nervously." Some of the lining of the left pocket was still sticking out. Worthy asked the two if they needed anything and instructed them to go to class. The minor finished fixing his pocket and went back to class. Worthy followed them to see where they were going because the minor acted "very paranoid and nervous." She then notified her supervisor and at his direction summoned another security officer.

When the two officers went to the classroom, Worthy asked the minor if she could see him outside. Once in the hallway, Worthy asked the minor if he had anything on him. He replied "no" and repeated that denial when asked again. The second officer asked the minor for consent to search his bag. The minor consented, and replied "no" again to Worthy's repeated question whether he had anything on him. The second officer then asked the minor for permission to do a patdown search. Worthy asked if it was okay, and the minor replied "yes." A patdown search by the other officer revealed a knife, later found to have a locking blade, in the minor's left pocket.

During the 10 minutes the minor was in the hallway being questioned by Worthy before the consent to search was given, he was not free to leave.

Commenting that the officer had engaged in "good security work" based on the minor's looking nervous or paranoid and adjusting his pocket upon seeing her, the judge denied the motion to suppress.

---

[1] This appears to be a term used to describe the time between classes when high school students move from one classroom to another.

On appeal from the order declaring him a ward of the court, the minor repeated the arguments made in support of his motion to exclude the knife—i.e., that because the campus security officer had lacked reasonable suspicion of criminal activity or violation of a school rule, the detention violated his right to be free of unreasonable searches and seizures guaranteed by the Fourth Amendment, and that his consent to search was a product of that unlawful detention. The Court of Appeal agreed with the minor that the standard to be applied was whether "the detaining officer has reasonable suspicion that the person to be detained has been, is, or is about to be engaged in criminal activity" (*In re Frederick B.*, *supra*, 192 Cal.App.3d at pp. 84-85) or is about to engage in a violation of those school rules that exist for the protection of other students attending school or for the preservation of order at the school. The *Frederick B.* court had adapted its standard for judging the lawfulness of a *detention* of a student from *In re William G.* (1985) 40 Cal.3d 550, 564 [221 Cal.Rptr. 118, 709 P.2d 1287] (*William G.*) and *New Jersey v. T. L. O.* (1985) 469 U.S. 325, 341-342 [105 S.Ct. 733, 742-743, 83 L.Ed.2d 720] (*T. L. O.*), both of which involved the *search* of a student. Applying that standard (as expanded to include school rules and regulations designed for the protection of students or the preservation of order), the Court of Appeal held that the detention of the minor was reasonable. The minor's violation of a school rule, together with his nervous fixing of the protruding lining of his pocket, gave rise to reasonable suspicion sufficient to justify a detention for the purpose of asking questions about the conduct the security officer had observed.

In this court, the minor contends that no articulable facts supported a reasonable suspicion of misconduct. The People argue that the reasonable-suspicion standard does not apply to a detention of a student by a school official on school grounds.

## II

### DISCUSSION

According to the minor, the question presented here is whether the circumstances outlined above "made the security officer aware of sufficient 'articulable facts' to warrant reasonable suspicion that [the minor] was committing a crime, or violating a rule designed to protect other students or to maintain order in the school, thereby justifying his detention for investigation of the offense." He contends that the absence of facts supporting reasonable suspicion rendered his detention invalid under the Fourth Amendment, requiring suppression of the locking-blade knife found in his pocket.

To decide whether relevant evidence obtained by assertedly unlawful means must be excluded, we look exclusively to whether its suppression is

required by the United States Constitution. (*In re Lance W.* (1985) 37 Cal.3d 873, 885-890 [210 Cal.Rptr. 631, 694 P.2d 744].)

A

The first question, then, is whether the minor was detained. A detention occurs "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen . . . ." (*Terry v. Ohio* (1968) 392 U.S. 1, 19, fn. 16 [88 S.Ct. 1868, 1879, 20 L.Ed.2d 889]; *People v. Souza* (1994) 9 Cal.4th 224, 229 [36 Cal.Rptr.2d 569, 885 P.2d 982].) In the general run of cases, where the police have succeeded in apprehending the suspect, there is no dispute that the suspect's liberty has been thereby restrained. (E.g., *Terry, supra,* 392 U.S. at pp. 6-7 [88 S.Ct. at p. 1872] [officer grabbed defendant while he was walking down the street and spun him around]; *Souza, supra,* 9 Cal.4th at p. 228 [defendant was stopped while running down the street].) After all, in those cases, the defendant, in the absence of the stop, would have been free to continue on his way.

A minor at school, however, can hardly be said to be free to continue on his or her way. "Traditionally at common law, and still today, unemancipated minors lack some of the most fundamental rights of self-determination—including even the right of liberty in its narrow sense, *i.e.,* the right to come and go at will. They are subject, even as to their physical freedom, to the control of their parents or guardians." (*Vernonia School Dist. 47J v. Acton* (1995) 515 U.S. 646, 654 [115 S.Ct. 2386, 2391, 132 L.Ed.2d 564] (*Vernonia*).) Although the high court has rejected the notion that public schools, like private schools, exercise only parental power over their students, the power that public schools do exercise is nonetheless "custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults." (*Id.* at p. 655 [115 S.Ct. at p. 2392].)

To begin, minor students are required to be in school. (Ed. Code, § 48200.) While they are there, the "primary duty of school officials and teachers . . . is the education and training of young people. A State has a compelling interest in assuring that the schools meet this responsibility. Without first establishing discipline and maintaining order, teachers cannot begin to educate their students. And apart from education, the school has the obligation to protect pupils from mistreatment by other children, and also to protect teachers themselves from violence by the few students whose conduct in recent years has prompted national concern." (*T. L. O., supra,* 469 U.S. 325, 350 [105 S.Ct. 733, 747] (conc. opn. of Powell, J.); Cal. Const., art. I, § 28, subd. (c) ["All students and staff of public primary, elementary,

junior high and senior high schools have the inalienable right to attend campuses which are safe, secure and peaceful"].) California fulfills its obligations by requiring each school board to establish rules and regulations to govern student conduct and discipline (Ed. Code, § 35291) and by permitting the local district to establish a police or security department to enforce those rules. (Ed. Code, § 38000.)

At school, events calling for discipline are frequent occurrences and sometimes require "immediate, effective action." (*Goss v. Lopez* (1975) 419 U.S. 565, 580 [95 S.Ct. 729, 739, 42 L.Ed.2d 725].) To respond in an appropriate manner, " 'teachers and school administrators must have broad supervisory and disciplinary powers.' " (*William G., supra*, 40 Cal.3d at p. 563, quoting *Horton v. Goose Creek Ind. Sch. Dist.* (5th Cir. 1982) 690 F.2d 470, 480.) California law, for example, permits principals, teachers, and any other certificated employees to exercise "the same degree of physical control over a pupil that a parent would be legally privileged to exercise . . . which in no event shall exceed the amount of physical control reasonably necessary to maintain order, protect property, or protect the health and safety of pupils, or to maintain proper and appropriate conditions conducive to learning." (Ed. Code, § 44807.)

Encounters on school grounds between students and school personnel are constant and much more varied than those on the street between citizens and law enforcement officers. While at school, a student may be stopped, told to remain in or leave a classroom, directed to go to a particular classroom, given an errand, sent to study hall, called to the office, or held after school. Unlike a citizen on the street, a minor student is "subject to the ordering and direction of teachers and administrators. . . . [¶] [A student is] not free to roam the halls or to remain in [the] classroom as long as she please[s], even if she behave[s] herself. She [is] deprived of liberty to some degree from the moment she enter[s] school, and no one could suggest a constitutional infringement based on that basic deprivation." (*Wallace by Wallace v. Batavia School Dist. 101* (7th Cir. 1995) 68 F.3d 1010, 1013 (*Wallace*); see also *Milligan v. City of Slidell* (5th Cir. 2000) 226 F.3d 652, 655 (*Milligan*) ["any such right of unhindered attendance [in class] is logically inconsistent with the mandate of compulsory attendance and a structured curriculum, and it hardly squares with the schools' obligation to 'inculcate the habits and manners of civility . . . .' "].)

Thus, when a school official stops a student to ask a question, it would appear that the student's liberty has not been restrained over and above the limitations he or she already experiences by attending school. Accordingly, the conduct of school officials in moving students about the

classroom or from one classroom to another, sending students to the office, or taking them into the hallway to ask a question would not seem to qualify as a detention as defined by the Fourth Amendment. In the absence of a Fourth Amendment claim, relief, if at all, would come by showing that school officials acted in such an arbitrary manner as to deprive the student of substantive due process in violation of the Fourteenth Amendment. (See *County of Sacramento v. Lewis* (1998) 523 U.S. 833, 845-847 [118 S.Ct. 1708, 1716-1717, 140 L.Ed.2d 1043].)

A number of factors, however, counsel caution before holding that the Fourth Amendment does not apply to the exercise of physical control by school officials over their students. First, we must acknowledge the United States Supreme Court's reluctance to expand the concept of substantive due process. The court has instructed that " '[w]here a particular Amendment provides an explicit textual source of constitutional protection against *a particular sort of government behavior*, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.' " (*County of Sacramento v. Lewis, supra*, 523 U.S. at p. 842 [118 S.Ct. at p. 1714], italics added.) Here, of course, the "particular sort of government behavior" engaged in by school officials would unquestionably constitute a detention *outside* the school setting.

Second, we have employed the Fourth Amendment framework in the analogous circumstances of parole and probation searches, even though it might appear that parolees and probationers have no Fourth Amendment protection against suspicionless searches and seizures. (See *People v. Reyes* (1998) 19 Cal.4th 743 [80 Cal.Rptr.2d 734, 968 P.2d 445]; *In re Tyrell J.* (1994) 8 Cal.4th 68 [32 Cal.Rptr.2d 33, 876 P.2d 519].) In *Tyrell J.*, for example, we held that a juvenile probationer subject to a valid search condition does not have a *reasonable* expectation of privacy over his or her person or property, which is the " 'touchstone' " of Fourth Amendment analysis. (*Tyrell J.*, at pp. 83, 86.) Nonetheless, we rejected the notion that the probationer has no legally cognizable privacy rights at all and permitted the probationer to challenge a search as arbitrary, capricious, or undertaken for harassment. (*Id.* at p. 87 & fn. 5.) Similarly, in *Reyes*, we held that a parolee subject to a valid search condition does not have "any expectation of privacy 'society is "prepared to recognize as legitimate" ' " yet may still challenge the search as arbitrary, capricious, or undertaken for harassment. (*Reyes, supra*, 19 Cal.4th at pp. 753-754.) By analogy, we might permit a minor student, even though he appears to retain no appreciable liberty on school grounds, to challenge the conduct of school officials as arbitrary, capricious, or harassing under the Fourth Amendment, which, after all, was crafted to " " "safeguard the privacy and security of individuals against

*arbitrary* invasions by governmental officials." ' . . ." (*Id.* at p. 750, citations omitted.)

Finally, we note that a number of federal cases have (without much analysis) held or assumed that, notwithstanding the considerable restraints on a student's movement by virtue of being at school, conduct by a school official to control that movement is a seizure within the meaning of the Fourth Amendment. (E.g., *Milligan, supra,* 226 F.3d at p. 655; *Wallace, supra,* 68 F.3d at pp. 1012-1014; *Hassan v. Lubbock Independent School Dist.* (5th Cir. 1995) 55 F.3d 1075, 1079-1080; *Edwards for and in behalf of Edwards v. Rees* (10th Cir. 1989) 883 F.2d 882, 884.)

Neither this court nor the Supreme Court has deemed stopping a student on school grounds during school hours, calling a student into the corridor to discuss a school-related matter, or summoning a student to the principal's office for such purposes to be a detention within the meaning of the Fourth Amendment. For the reasons stated above, we would be hesitant to term such conduct a "detention" here. However, we find it unnecessary to decide whether school officials' infringement on the residuum of liberty retained by the student is properly analyzed as a detention under the Fourth Amendment or as a deprivation of substantive due process under the Fourteenth Amendment, for (as we explain below) we discover that the test under either clause is substantially the same—namely, whether the school officials' conduct was arbitrary, capricious, or undertaken for purposes of harassment.

B

Although individualized suspicion is usually a prerequisite to a constitutional search or seizure, "such suspicion is not an 'irreducible' component of reasonableness." (*Indianapolis v. Edmond* (2000) 531 U.S. 32, 37 [121 S.Ct. 447, 451, 148 L.Ed.2d 333].) Under the Constitution, the usual prerequisites can be modified when " 'special needs' " render those rules impracticable. (See, e.g., *Griffin v. Wisconsin* (1987) 483 U.S. 868, 873 [107 S.Ct. 3164, 3168, 97 L.Ed.2d 709].) "Special needs" exist "in the public school context." (*Vernonia, supra,* 515 U.S. at p. 653 [115 S.Ct. at p. 2391].) In *T. L. O.,* for example, the court permitted the on-campus search of a minor student's person, the type of intrusion that ordinarily must be supported by probable cause to believe a violation of the law has occurred, so long as there were reasonable grounds for suspecting the search would uncover evidence of a violation of law or school rules. (*T. L. O., supra,* 469 U.S. at pp. 340-342 [105 S.Ct. at pp. 742-743].) In *Vernonia,* the court approved drug testing of student-athletes, even in the absence of any individualized suspicion of drug use, based once again on the special needs of the public school context. (*Vernonia, supra,* 515 U.S. at pp. 653-657 [115 S.Ct. at p. 2390-2393].)

*Vernonia* and *T. L. O.* both involved searches. The issue here is a seizure. ▮ Still, the test for assessing the reasonableness of official conduct under the Fourth Amendment is essentially the same: "it is necessary 'first to focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen,' for there is 'no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails.' " (*Terry v. Ohio, supra,* 392 U.S. at pp. 20-21 [88 S.Ct. at p. 1879], quoting *Camara v. Municipal Court* (1967) 387 U.S. 523, 534-537 [87 S.Ct. 1727, 1733-1735, 18 L.Ed.2d 930].) ▮ Here, "the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children." (*Vernonia, supra,* 515 U.S. at p. 656 [115 S.Ct. at p. 2392].)

The governmental interest at stake is of the highest order. "[E]ducation is perhaps the most important function of state and local governments." (*Brown v. Board of Education* (1954) 347 U.S. 483, 493 [74 S.Ct. 686, 691, 98 L.Ed. 873, 38 A.L.R.2d 1180].) "Some modicum of discipline and order is essential if the educational function is to be performed." (*Goss v. Lopez, supra,* 419 U.S. at p. 580 [95 S.Ct. at p. 739].) School personnel, to maintain or promote order, may need to send students into and out of classrooms, define or alter schedules, summon students to the office, or question them in the hall. Yet, as the high court has observed, school officials "are not in the business of investigating violations of the criminal laws . . . and otherwise have little occasion to become familiar with the intricacies of this Court's Fourth Amendment jurisprudence." (*Skinner v. Railway Labor Executives' Assn.* (1989) 489 U.S. 602, 623 [109 S.Ct. 1402, 1417, 103 L.Ed.2d 639].) Those officials must be permitted to exercise their broad supervisory and disciplinary powers, without worrying that every encounter with a student will be converted into an opportunity for constitutional review. To allow minor students to challenge each of those decisions, through a motion to suppress or in a civil rights action under 42 United States Code section 1983, as lacking articulable facts supporting reasonable suspicion would make a mockery of school discipline and order.

On the other hand, the intrusion on the minor student is trivial since, as stated, the minor is not free to move about during the school day. If the school can require the minor's presence on campus during school hours, attendance at assigned classes during their scheduled meeting times, appearance at assemblies in the auditorium, and participation in physical education classes out of doors, liberty is scarcely infringed if a school security guard leads the student into the hall to ask questions about a potential rule violation.

In *T. L. O.*, the court balanced the competing interests involving a search of a minor student on school grounds and reduced the quantum of suspicion required from probable cause to reasonable suspicion. The minor argues that the same reasonable-suspicion standard used for school searches should govern the assumed detention here. We disagree. Different interests are implicated by a search than by a seizure (*Horton v. California* (1990) 496 U.S. 128, 133 [110 S.Ct. 2301, 2305-2306, 110 L.Ed.2d 112]), and a seizure is "generally less intrusive" than a search. (*Segura v. United States* (1984) 468 U.S. 796, 806 [104 S.Ct. 3380, 3386, 82 L.Ed.2d 599](lead opn. of Burger, C. J.); cf. *United States v. Place* (1983) 462 U.S. 696, 706-708 [103 S.Ct. 2637, 2644-2645, 77 L.Ed.2d 110].) In recognition of that distinction, the constitutionality of investigative detentions of persons on the streets is already measured by the standard of reasonable suspicion, not probable cause. Were we simply to extend that standard to the school setting, we would have failed utterly to accommodate the special needs existing there. Therefore, we conclude instead that detentions of minor students on school grounds do not offend the Constitution, so long as they are not arbitrary, capricious, or for the purposes of harassment. (Cf. *People v. Reyes, supra*, 19 Cal.4th at pp. 753-754 [applying same test to search of parolees]; *In re Tyrell J., supra*, 8 Cal.4th at p. 87 [juvenile probationers]; *People v. Bravo* (1987) 43 Cal.3d 600, 610 [238 Cal.Rptr. 282, 738 P.2d 336] [adult probationers].) Reasonable suspicion—whether called "particularized suspicion" (*People v. Reyes, supra*, 19 Cal.4th at p. 754), "articulable and individualized suspicion" (*People v. Glaser* (1995) 11 Cal.4th 354, 369 [45 Cal.Rptr.2d 425, 902 P.2d 729]), "founded suspicion" (*People v. Souza, supra*, 9 Cal.4th at p. 230), or "reasonable cause" (*id.* at p. 232)—need not be shown.[2]

Our conclusion finds support in cases from other jurisdictions. In *In re D.E.M.* (1999) 1999 Pa.Super. 59 [727 A.2d 570], school officials, after learning that police had received an anonymous tip that the minor had a gun, removed the minor from class and brought him to the principal's office. The gun was discovered during a consent search. The minor sought to suppress the gun as the fruit of an unlawful detention. The court assessed the reasonableness of the school officials' conduct in removing the minor from class by balancing the state's substantial interest in maintaining a safe educational environment against the minor's limited control over his person during school hours and concluded that the policy served by *Terry*'s reasonable-suspicion standard does not apply to the detention and questioning of a student by school officials. (*Id.* at pp. 577-578 & fn. 19.) The court noted, as we have above, that "the mere detention and questioning of a student

---

[2]To the extent that *In re Alexander B.* (1990) 220 Cal.App.3d 1572 [270 Cal.Rptr. 342] and *In re Frederick B., supra*, 192 Cal.App.3d 79, are inconsistent with this conclusion, they are disapproved.

constitutes a more limited intrusion than a search of his person and effects. Thus, we think it makes no sense to require the same level of suspicion to justify the school officials' actions in each situation." (*Id.* at p. 577, fn. 18.) "To require teachers and school officials to have reasonable suspicion before merely questioning a student would destroy the informality of the student teacher relationship, which the United States Supreme Court has respected and preserved. *See T.L.O., supra*, at 339, 105 S.Ct. at 741, 83 L.Ed.2d at 733. Instead, teachers and school officials would be forced to conduct surveillance, traditionally a law enforcement function, before questioning a student about conduct which poses a serious threat to the safety of the students for whom they are responsible." (*Id.* at p. 577, fn. omitted.)

The Florida District Court of Appeal reached the same conclusion in *W. J. S. v. State* (Fla.Dist.Ct.App. 1982) 409 So.2d 1209. There, a teacher had a security guard bring four students to the principal's office; the students looked suspicious because "they 'appeared to look away from her, to look at something else.' " A subsequent search uncovered a small purse containing marijuana. The court held that reasonable suspicion was not necessary to "detain a student and take him . . . 'to be checked out' on the school premises." (*Id.* at p. 1210.)

The minor has never contended that Worthy acted arbitrarily, capriciously, or in a harassing manner in calling him into the hall. Hence, no Fourth Amendment violation occurred.

## C

Seemingly acknowledging the state's vital interest in establishing and maintaining a safe educational environment, the minor then urges that the reasonable-suspicion standard, even if inapplicable to the conduct of teachers and administrators, should apply to encounters between students and school *security officers*. In holding that the reasonable-suspicion standard remains appropriate for such cases, he reasons, this court will not necessarily be committing itself to that standard "across the whole range of student encounters with teachers, principals, or other personnel." We decline the invitation to distinguish the power of school security officers over students from that of other school personnel, whose authority over student conduct may have been delegated to those officers. The same observation and investigation here could well have been undertaken by a teacher, coach, or even the school principal or vice-principal. If we were to draw the distinction urged by the minor, the extent of a student's rights would depend not on the nature of the asserted infringement but on the happenstance of the status of the employee who observed and investigated the misconduct. Of equal

importance, were we to hold that school security officers have less authority to enforce school regulations and investigate misconduct than other school personnel, there would be no reason for a school to employ them or delegate to them duties relating to school safety. Schools would be forced instead to assign certificated or classified personnel to yard and hall monitoring duties, an expenditure of resources schools can ill afford. The title "security officer" is not constitutionally significant.[3] (Cf. *Ferguson v. City of Charleston* (2001) 532 U.S. 67, 83-84 [121 S.Ct. 1281, 1291-1292, 149 L.Ed.2d 205] [because the "primary purpose" of a program of testing obstetrics patients' urine for narcotics was "to generate evidence *for law enforcement purposes* . . . . this case simply does not fit within the closely guarded category of 'special needs' " (fns. omitted)].) Therefore, we will not interfere in the method by which local school districts assign personnel to monitor school safety.

## III

### DISPOSITION

The judgment of the Court of Appeal is affirmed.

George, C. J., Kennard, J., Chin, J., and Brown, J., concurred.

**WERDEGAR, J.**—I concur. We face in this case a tension between two important considerations. On the one hand, teachers and school administrators have a solemn responsibility to protect the safety and well-being of our children and to ensure that schools can fulfill their educational mission.[1] On the other hand, minor children attending school, like all persons in America, possess rights under the Constitution. (See, e.g., *New Jersey v. T.L.O., supra,* 469 U.S. at pp. 333-334 [105 S.Ct. at pp. 738-739] [Fourth Amendment rights]; *Tinker v. Des Moines Independent School Dist.* (1969) 393 U.S. 503, 506 [89 S.Ct. 733, 736, 21 L.Ed.2d 731] (*Tinker*) [First Amendment rights];

---

[3]The minor did not describe Worthy or the other guard as a law enforcement officer in his motion to suppress, which refers instead to a "School Official." Once found, the knife was turned over by the school principal to Officer Berrera, who was employed by the City of Montebello as a school police officer. The Montebello Police Department took the minor into custody and referred him for juvenile proceedings. In short, the school security officers who found the knife did not act as law enforcement officers. We therefore do not consider here the appropriate standard for assessing the lawfulness of seizures conducted by school officials in conjunction with or at the behest of law enforcement agencies. (See *T. L. O., supra,* 469 U.S. at p. 341, fn. 7 [105 S.Ct. at p. 743].)

[1]"The primary duty of school officials and teachers . . . is the education and training of young people. A State has a compelling interest in assuring that the schools meet this responsibility. Without first establishing discipline and maintaining order, teachers cannot begin to educate their students." (*New Jersey v. T. L. O.* (1985) 469 U.S. 325, 350 [105 S.Ct. 733, 747, 83 L.Ed.2d 720] (conc. opn. of Powell, J.).)

*Goss v. Lopez* (1975) 419 U.S. 565 [95 S.Ct. 729, 42 L.Ed.2d 725] [due process rights].)[2]

The high court, while recognizing that students do not leave their constitutional rights "at the schoolhouse gate" (*Tinker, supra,* 393 U.S. at p. 506 [89 S.Ct. at p. 736]), has also recognized the need for balance in evaluating the scope of their Fourth Amendment rights, explaining that "maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures, and we have respected the value of preserving the informality of the student-teacher relationship." (*New Jersey v. T. L. O., supra,* 469 U.S. at p. 340 [105 S.Ct. at p. 742].) In addition, "[i]t is evident that the school setting requires some easing of the restrictions to which searches by public authorities are ordinarily subject." (*Ibid.*)

The majority acknowledges this framework by considering a minor student's right to freedom from unreasonable searches and seizures under the Fourth Amendment within the context of a modern school setting. Although students unquestionably retain Fourth Amendment rights while in school, and "public school officials are subject to the limits placed on state action by the Fourteenth Amendment" (*New Jersey v. T. L. O., supra,* 469 U.S. at p. 334 [105 S.Ct. at p. 739]), not every encounter between teacher and student implicates the Fourth Amendment, for "the nature of those [constitutional] rights is what is appropriate for children in school." (*Vernonia School Dist. 47J v. Acton* (1995) 515 U.S. 646, 656 [115 S.Ct. 2386, 2392, 132 L.Ed.2d 564] (*Vernonia*); cf. *Terry v. Ohio* (1968) 392 U.S. 1, 19, fn. 16 [88 S.Ct. 1868, 1879, 20 L.Ed.2d 889] ["not all personal intercourse between policemen and citizens involves 'seizures' of persons"].)

Moreover, even where, as here, the circumstances of the encounter as viewed in the context of a school setting arguably support the conclusion the minor has been subjected to a "seizure" within the meaning of the Fourth Amendment, the standard for assessing the reasonableness of the challenged action must take into account "the schools' custodial and tutelary responsibility for children." (*Vernonia, supra,* 515 U.S. at p. 656 [115 S.Ct. at p. 2392].) As *Terry v. Ohio, supra,* 392 U.S. at page 21 [88 S.Ct. at page 1879], recognizes, "there is 'no ready test for determining reasonableness other than by balancing the need to [seize] against the invasion which the [seizure] entails.'" (Quoting *Camara v. Municipal Court* (1967) 387 U.S. 523, 536-537 [87 S.Ct. 1727, 1734-1735, 18 L.Ed.2d 930].) Accordingly, I agree with

---

[2]That school officials "are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." (*Board of Education v. Barnette* (1943) 319 U.S. 624, 637 [63 S.Ct. 1178, 1185, 87 L.Ed. 1628, 147 A.L.R. 674].)

the majority's conclusion that "detentions of minor students on school grounds do not offend the Constitution, so long as they are not arbitrary, capricious, or for the purposes of harassment." (Maj. opn., *ante*, at p. 567.)

The majority finds it unnecessary to decide whether the security guard in this case subjected minor Randy G. to a detention within the meaning of the Fourth Amendment. (Maj. opn., *ante*, at p. 565.) Accordingly, the majority does not foreclose the possibility that a teacher or school official may be found, in an appropriate setting, to have done so. With that understanding of the majority opinion, I concur.