Filed 6/21/13  In re Alejandro C. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| In re ALEJANDRO C., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, | C072387 |
| Plaintiff and Respondent, | (Super. Ct. No. 69145) |
| v. | |
| ALEJANDRO C., | |
| Defendant and Appellant. | |

Following a contested jurisdiction hearing, the San Joaquin County Juvenile Court found that minor Alejandro C., age 15, came within the provisions of Welfare and Institutions Code section 602 in that he resisted or obstructed a peace officer.  An allegation that the minor committed battery on a school employee was dismissed due to insufficient evidence.  The minor was adjudged a ward, ordered to participate for eight days in a juvenile work program, and released to his mother's custody under various terms and conditions of probation.

1

On appeal, the minor contends there was no substantial evidence that the officer was acting lawfully when the minor resisted.  We affirm.

FACTS

*Prosecution's Case-In-Chief*

On the afternoon of May 17, 2012, San Joaquin County Sheriff's Deputy Cody Brum was working as a school resource officer at Franklin High School.  After school concluded for the day, Brum observed the minor "walking away from the front of Franklin High School to the bus stop" where other students were standing.  The minor was "[w]alking away from" the school principal as he "was trying to stop" the minor.  The two were still at "a part of the school" as both were on the lots between the school and staff parking lot and Brum was on an adjacent sidewalk.

Deputy Brum explained that the principal "was walking behind the [minor] and telling him to stop and pointed at me and then pointed at the [minor] to stop him."  Brum said the principal's conduct suggested to him "[t]hat something had happened."

Deputy Brum then "walked to get in front of" the minor.  Brum described what happened next:  "As I walked in front of [the minor], the principal reached out and grabbed his backpack and the [minor] turned and *the principal stepped back as if he was pushed.*"  (Italics added.)  After the principal stepped back, Deputy Brum told the minor to "put his hands behind his back."  The minor did not comply.  Brum grabbed the minor's arm, and the duo "moved toward a wrought iron fence that [the minor] grabbed."

As the minor grabbed the fence, Deputy Brum "again told him to put his hands behind his back, and he refused."  Rather than comply, the minor "continued to hold onto the fence."  Brum "put a handcuff on [the minor's] right hand and told him to put his hands behind his back again, and he refused."

Eventually, Deputy Brum was able to get the minor's hands off of the fence.  As Brum held the minor's right arm and the principal held his left arm, the minor "resisted and would not comply with directives."  The minor "spun around, continue[d] to spin and

2

try to just get away." Ultimately, Brum was successful in putting the handcuffs on the minor.

After taking the minor into custody, Deputy Brum "escorted him to the principal's office." As they were walking, the minor told Brum "to stop touching him and spun away again and . . . bent down at his waist," requiring Brum "to grab him again."

While he was in the principal's office, the minor tried to maneuver the handcuffs to the front of his body. Deputy Brum explained: "He tried to put the handcuffs under his butt and ended up with them stuck on the back side of his knee." At that point, Brum "asked [the minor] if he could stand up so I could fix his handcuffs. He didn't comply again."

Later, after being advised of his rights, the minor told Deputy Brum why he had been uncooperative. The minor explained that he "was walking with a girl. The principal told him to separate, and he did. He continued to walk, and the principal grabbed his bag and he turned and pushed his hands away, and then didn't want to comply because he didn't like being told what to do." The minor told Brum he "was trying to get away" because "he felt he was being treated like an animal."

*Defense*

The minor testified on his own behalf and said he was in the ninth grade. After school on May 17, 2012, about 2:10 p.m., the principal approached the minor as he was walking toward the bus stop. Earlier that day, the principal "had told [the minor] to stop holding [his] friend's hand. So [the minor] had let go." The principal said the school had a rule against hand-holding, but the minor had not been aware of the rule.

The minor testified that, after releasing his friend's hand, he began walking. The principal called out to the minor. He did not hear the principal and kept walking. At one point, the minor saw "[Deputy Brum] in front of [him] and [the principal] behind" him. Then the minor felt a push and believed the principal had pushed him. The minor "turned around and told [the principal] to stop and let [him] go because [he] did nothing wrong."

3

The minor testified that, after being pushed, he "started restraining [*sic*] because [Deputy Brum] and the principal were trying to take [him] down." The minor said he resisted Brum because he "didn't do anything wrong" and Brum "had no right to touch" him.

Deputy Brum told the minor to put his hands behind his back. The minor did not comply because he felt threatened and "was just using self-defense" against the officer and the principal.

## DISCUSSION

The minor contends the judgment must be reversed because no substantial evidence shows that Deputy Brum was acting lawfully when the minor resisted him. We are not persuaded.

### A

#### *Standard Of Review*

In an "appeal challenging the sufficiency of the evidence to support a juvenile court judgment sustaining the criminal allegations of a petition made under the provisions of section 602 of the Welfare and Institutions Code, we must apply the same standard of review applicable to any claim by a criminal defendant challenging the sufficiency of the evidence to support a judgment of conviction on appeal. Under this standard, the critical inquiry is 'whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] An appellate court 'must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence--that is, evidence which is reasonable, credible, and of solid value-- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.]" (*In re Ryan N.* (2001) 92 Cal.App.4th 1359, 1371.)

B

*Elements Of Penal Code Section 148*

Penal Code section 148, subdivision (a)(1), provides in relevant part: "Every person who willfully resists, delays, or obstructs any . . . peace officer . . . in the discharge or attempt to discharge any duty of his or her office or employment, when no other punishment is prescribed, shall be punished by a fine not exceeding one thousand dollars ($1,000), or by imprisonment in a county jail not to exceed one year, or by both that fine and imprisonment."

"The legal elements of that crime are as follows: ' "(1) the defendant willfully resisted, delayed, or obstructed a peace officer, (2) when the officer was engaged in the performance of his or her duties, and (3) the defendant knew or reasonably should have known that the other person was a peace officer engaged in the performance of his or her duties." ' [Citation.]" (*Yount v. City of Sacramento* (2008) 43 Cal.4th 885, 894-895.)

"Section 148 is most often applied to the physical acts of a defendant. [Citation.] . . . [such as] physical resistance, hiding, or running away from a police officer." (*In re Muhammed C.* (2002) 95 Cal.App.4th 1325, 1329.) But the crime "is not limited to nonverbal conduct involving flight or forcible interference with an officer's activities. No decision has interpreted the statute to apply only to physical acts, and the statutory language does not suggest such a limitation." (*People v. Quiroga* (1993) 16 Cal.App.4th 961, 968.)

A "[d]efendant cannot be convicted of an offense against an officer engaged in the performance of official duties unless the officer was acting lawfully at the time. [Citation.] 'The rule flows from the premise that because an officer has no duty to take illegal action, he or she is not engaged in "duties," for purposes of an offense defined in such terms, if the officer's conduct is unlawful. [Citations.]' [Citation.]" (*People v. Simons* (1996) 42 Cal.App.4th 1100, 1109.)

5

" 'Under California law, an officer is not lawfully performing her duties when she *detains an individual without reasonable suspicion* or arrests an individual without probable cause.' [Citation.]" (*Garcia v. Superior Court* (2009) 177 Cal.App.4th 803, 819.)

C

*Detentions On School Grounds*

Although, as we have noted, a lawful detention commonly requires that the officer have reasonable suspicion, a lesser standard applies to detentions of minor students on school grounds. "[D]etentions of minor students on school grounds do not offend the Constitution, so long as they are not arbitrary, capricious, or for the purposes of harassment. [Citations.] Reasonable suspicion--whether called 'particularized suspicion' [citation], 'articulable and individualized suspicion' [citation], 'founded suspicion' [citation], or 'reasonable cause' [citation]--need not be shown." (*In re Randy G.* (2001) 26 Cal.4th 556, 567.) Applying *Randy G*, the juvenile court ruled that Deputy Brum did not need reasonable suspicion in order to detain the minor.

The minor contends *Randy G*. "is distinguishable" because, here, "there was no evidence the minor resisted [Deputy] Brum's detention *on school grounds during school hours*." The minor's first claim -- that the detention was not on school grounds -- fails because Brum testified that the area where the detention occurred was "still part of the school." Brum's uncertainty whether the place was "on the school campus" does not detract from the fact that it was part of the school.

The minor's second claim -- that the detention did not occur during school hours -- appears to find support in Deputy Brum's acknowledgment that the detention occurred "after school." But Brum made plain that the incident occurred immediately following school hours, while students were preparing to board an afternoon bus.

*Randy G.* acknowledged that a minor student " '[is] deprived of liberty to some degree *from the moment she enter[s] school*, and no one could suggest a constitutional infringement based on that basic deprivation.' [Citations.]" (*In re Randy G.*, *supra*, 26 Cal.4th at p. 563, italics added.) The obvious, if unarticulated, corollary is that the deprivation of liberty *continues until the moment the student leaves school,* by means such as riding the afternoon bus.

*Randy G.* further acknowledged that a student is " 'not free to roam the halls or to remain in [the] classroom as long as she please[s], even if she behave[s] herself.' " (*In re Randy G.*, *supra*, 26 Cal.4th at p. 563.) Thus, even a well-behaved student is not free to linger in a classroom or hall, for as long as she pleases, *following the conclusion of the school day*. Rather, the student must leave school by some appropriate means, such as walking or riding a bus. Nothing in *Randy G.* suggests that students traversing school property at the end of the day are less subject to supervision by school authorities than they had been while seated in the classroom. Indeed, a rule lessening the ability of school authorities to supervise students enroute to the afternoon bus could hamper the school's ability to fulfill its constitutional responsibility to furnish safe, secure and peaceful schools. (Cal. Const., art. I, § 28, subd. (f)(1); *Randy G.* at pp. 562-563.)

In sum, the minor's argument that Deputy Brum detained him "*outside* the school setting" has no merit. The juvenile court properly determined that *Randy G.* applied to this case.

The minor nevertheless contends his detention was unreasonable because there was insufficient evidence that it was "not arbitrary, capricious, or for the purposes of harassment." (*In re Randy G., supra,* 26 Cal.4th at p. 567.) But the juvenile court could infer that the detention was for the purpose of investigating, first, whether the minor had pushed the school principal; and second, whether the minor had done so without legal justification.

7

The evidence showed that Deputy Brum first saw the minor as he was "[w]alking away from" the school principal as he "was trying to stop" the minor. Brum said the principal "was walking behind the [minor] and telling him to stop." The principal then pointed at Brum "and then pointed at the [minor] to stop him." Brum said the principal's conduct suggested to him "[t]hat something had happened."

Deputy Brum then "walked to get in front of" the minor. Brum described what happened next: "As I walked in front of [the minor], the principal reached out and grabbed his backpack and the [minor] turned and *the principal stepped back as if he was pushed*." (Italics added.) After the principal stepped back, Deputy Brum told the minor to "put his hands behind his back." The minor did not comply. Brum grabbed the minor's arm, and the duo "moved toward a wrought iron fence that [the minor] grabbed."

Thus, the evidence was ambiguous as to whether the minor had pushed the principal and, if so, whether the minor had done so without legal justification. "[T]he possibility that the circumstances are consistent with lawful activity does not render a detention invalid, where the circumstances also raise a reasonable suspicion of criminal activity. The public rightfully expects a police officer to inquire into such circumstances; indeed the principal function of the investigative stop is to resolve that ambiguity. [Citation.]" (*People v. Dolliver* (1986) 181 Cal.App.3d 49, 56.) Even if the principal's conduct prior to the evident push had been arbitrary and capricious, and even if Brum had not been entitled to detain the minor simply "because he did not obey the principal's order to stop," Brum *was* entitled to stop the minor in order to investigate whether he had unlawfully pushed the principal. (*Ibid.*) The observed act of a student pushing a principal was sufficiently out of the ordinary that it raised "more than an 'inchoate and unparticularized suspicion or "hunch." ' [Citation.]" (*United States v. Sokolow* (1989) 490 U.S. 1, 7 [104 L.Ed.2d 1, 10].) Even if *Randy G.* did not apply to this case, we would conclude Deputy Brum had reasonable suspicion to detain the minor.

8

DISPOSITION

The judgment is affirmed.


      ROBIE     , J.


We concur:


    HULL    , Acting P. J.


    DUARTE   , J.