183 Cal.App.4th 72 (2010)
In re K.S., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent,
v.
K.S., Defendant and Appellant.
No. A124698.
Court of Appeals of California, First District, Division Five.
March 25, 2010.
CERTIFIED FOR PARTIAL PUBLICATION[*]
*75 Rachel Lederman, under appointment by the Court of Appeal, for Defendant and Appellant.
Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Martin S. Kaye and Ronald E. Niver, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION
SIMONS, Acting P. J.
In its landmark decision on searches of students by school officials, the United States Supreme Court concluded such searches were justified if "`reasonable,'" though no warrant had been obtained and the "probable cause" required for a police search did not exist. (New Jersey v. T.L.O. (1985) 469 U.S. 325, 341 [83 L.Ed.2d 720, 105 S.Ct. 733] (T.L.O.).) The high court declined, however, to determine the applicable standard when the school officials conduct the search "in conjunction with or at the behest of law enforcement agencies." (Id. at p. 341, fn. 7.) The facts of our case directly raise this issue. In the published portion of this opinion, we conclude that when a school official independently decides to search a student and then conducts that search, the T.L.O. standard applies, even if the police provide the information justifying the search and are present when it occurs. In the unpublished portion, we apply the reasonable suspicion standard to our facts and uphold the trial court's decision to deny the motion to suppress filed by appellant K.S. In addition, we accept appellant's argument, conceded by the People, that a minute order reflecting a three-year maximum term of commitment is erroneous and must be stricken.

*76 BACKGROUND[1]
Around 12:45 p.m. on September 25, 2008, Livermore Narcotics Detective Harrison received a message from a confidential informant that appellant, a student at Livermore High School, possessed Ecstasy pills, hidden in a slit in his pants. Harrison had used this informant before; the informant's information had led to two prior arrests; and no information Harrison received from the informant had previously been found untruthful.
After receiving the tip, Harrison contacted Livermore Police Officer Cabral, the school resource officer at Granada High School. Harrison advised Cabral of the tip and asked him to follow up on it. Cabral then contacted Anne Harter Dolid,[2] the vice-principal of Livermore High School, and summarized what Harrison had told him. Cabral did not ask Dolid to search or further investigate appellant. Cabral then informed Harrison that he had contacted Dolid and provided her with the information. Thereafter, Harrison went to the school to see if the school was going to follow up on the information given to Dolid. Harrison did not ask the school to do any followup.
Because the information came from Cabral, Dolid believed the tip to be reliable. Thereafter, Dolid confirmed appellant was at school that day. She then decided to search appellant to ensure the safety of the school's students. According to Dolid, having drugs on the school campus "compromises the safety of our students." Dolid ascertained that appellant was scheduled for a physical education (P.E.) class and she had a school security officer verify that appellant was present at that class and dressed for P.E. After learning that appellant was in the P.E. class and was not wearing his street clothes, Dolid decided to search appellant's P.E. locker.
Dolid, accompanied by Harrison and Livermore Police Detective Sergeant Conley, went to appellant's P.E. locker and a campus supervisor opened it. Dolid said she had the police officers accompany her "[b]ecause [she] didn't feel comfortable if [she] had found something[,] keeping it on [her] person across campus. [She] wanted to be able to have them with [her] so that ... [she] felt comfortable and safe." However, she did not ask either Harrison or Conley to conduct the search.
Dolid searched the locker and found the jeans with the slit. Inside the slit was a plastic bag containing several pills. Dolid then took the pants to the school office, and appellant was detained. Dolid suspected the pills found *77 were Ecstasy, and Harrison later confirmed that suspicion. Cabral arrived at the school after the search was completed and told Dolid the amount of Ecstasy found was consistent with possession for sale.
A juvenile court petition was subsequently filed against appellant (Welf. & Inst. Code, § 602), alleging he possessed Ecstasy (Health & Saf. Code, § 11377). After filing an unsuccessful motion to suppress (Welf. & Inst. Code, § 700.1), appellant admitted the offense. He appeals the dispositional order making him a ward of the juvenile court and placing him on home probation.

DISCUSSION

I. Standard of Review[*]

II. The Reasonable Suspicion Standard Applies to the Search of Appellant

Appellant contends the warrantless, reasonable suspicion standard for school officials set out in T.L.O. does not apply because, in conducting the locker search, Dolid was "carrying out a police initiated investigation in cooperation with the police for law enforcement purposes." Alternatively, he argues that Dolid did not have sufficient facts regarding the informant's tip to possess an objectively reasonable suspicion. Finally, he argues that even if Harrison's knowledge was imputed to Dolid, there was insufficient evidence that this information was reliable enough to support a reasonable suspicion. In particular, he argues no evidence was presented regarding the validity of the two arrests resulting from the informant's tip, or the basis for the informant's knowledge. Moreover, no proof corroborating the tip was introduced. Thus, the tip could not supply Dolid with reasonable suspicion to conduct the locker search.
In T.L.O., the United States Supreme Court addressed the constitutionality of student searches by teachers and school officials. A teacher observed a student, T.L.O., smoking in a lavatory, a violation of school rules, and escorted her to the office of the assistant vice-principal, Theodore Choplick. After T.L.O. denied the infraction, Choplick found a pack of cigarettes in her purse. As he removed the cigarettes, he noticed a package of cigarette rolling papers. He suspected that the papers were connected to marijuana use, and a thorough search of the purse confirmed his suspicion. Choplick then notified the police, and T.L.O. was subsequently prosecuted for possession of the contraband. (T.L.O., supra, 469 U.S. at pp. 328-329.)
*78 (1) In reviewing the propriety of the search of T.L.O.'s purse, the high court concluded the Fourth Amendment to the United States Constitution applies to searches of students conducted by public school officials. (T.L.O., supra, 469 U.S. at pp. 333-337.) The court determined that, under the Fourth and Fourteenth Amendments, students have legitimate expectations of privacy in the personal belongings they carry to school. (469 U.S. at p. 339.) The court also emphasized that "[e]ven in schools that have been spared the most severe disciplinary problems, the preservation of order and a proper educational environment requires close supervision of schoolchildren, as well as the enforcement of rules against conduct that would be perfectly permissible if undertaken by an adult." (Ibid.) In balancing the competing interests of the school and the student, the court held that teachers and school officials need not obtain a warrant or have probable cause to search a student. "Rather, the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search." (Id. at p. 341.) The reasonableness of a student search must be "`justified at its inception'" and "`... reasonably related in scope to the circumstances which justified the interference in the first place' [citation]. Under ordinary circumstances, a search of a student by a teacher or other school official will be `justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." (Id. at pp. 341-342, fns. omitted.)
Shortly after the decision in T.L.O., our Supreme Court addressed this issue in In re William G. (1985) 40 Cal.3d 550, 564 [221 Cal.Rptr. 118, 709 P.2d 1287] (William G.), and adopted the T.L.O. standard under the California Constitution.[3]William G., like T.L.O., declined to address the standard for searches conducted by school officials "in conjunction with or at the behest of law enforcement agencies." (T.L.O., supra, 469 U.S. at p. 341, fn. 7; accord, William G., at p. 562, fn. 12 ["we do not reach the issue of what standard should apply where law enforcement officials are involved at the outset of a student search, or where a school official acts in cooperation with, or as an agent of, law enforcement"].) Unlike T.L.O. and William G., in our case, a police detective provided the information relied on by school officials to conduct the search and was present when the search occurred. Does this level of interaction justify rejection of the T.L.O. reasonable suspicion standard?
(2) "[M]inor students are required to be in school. [Citation.] While they are there, the `primary duty of school officials and teachers ... is the education and training of young people. A State has a compelling interest in *79 assuring that the schools meet this responsibility. Without first establishing discipline and maintaining order, teachers cannot begin to educate their students. And apart from education, the school has the obligation to protect pupils from mistreatment by other children, and also to protect teachers themselves from violence by the few students whose conduct in recent years has prompted national concern.' [Citations.] California fulfills its obligations by requiring each school board to establish rules and regulations to govern student conduct and discipline [citation] and by permitting the local district to establish a police or security department to enforce those rules. [Citation.] [¶] At school, events calling for discipline are frequent occurrences and sometimes require `immediate, effective action.' [Citation.] To respond in an appropriate manner `"teachers and school administrators must have broad supervisory and disciplinary powers."' [Citation.] California law, for example, permits principals, teachers, and any other certificated employees to exercise `the same degree of physical control over a pupil that a parent would be legally privileged to exercise ... which in no event shall exceed the amount of physical control reasonably necessary to maintain order, protect property, or protect the health and safety of pupils, or to maintain proper and appropriate conditions conducive to learning.' [Citation.]" (In re Randy G. (2001) 26 Cal.4th 556, 562-563 [110 Cal.Rptr.2d 516, 28 P.3d 239] (Randy G.).)
(3) Students do not abandon their privacy rights on the schoolhouse steps. However, having compelled their attendance, school officials have a strong interest in creating and maintaining a safe and secure learning environment. Randy G. is instructive. It concluded that school officials have the power to detain a student for investigation of misconduct in the absence of reasonable suspicion if their authority is not exercised in an arbitrary, capricious, or harassing manner. (Randy G., supra, 26 Cal.4th at pp. 559, 565.)[4] That ruling rested, in part, on the court's analysis of the school's interest: "The governmental interest at stake is of the highest order. `[E]ducation is perhaps the most important function of state and local governments.' [Citation.] `Some modicum of discipline and order is essential if the educational function is to be performed.' [Citation.]" (26 Cal.4th at p. 566.) School personnel "must be permitted to exercise their broad supervisory and disciplinary powers, without worrying that every encounter with a student will be converted into an opportunity for constitutional review." (Ibid.)
A certain level of cooperation between school and police officials is likely when violations of the criminal law, as well as the student code of conduct, *80 are the basis for discipline. In In re William V. (2003) 111 Cal.App.4th 1464 [4 Cal.Rptr.3d 695] (William V.), the court examined one form of that cooperation: a police officer was assigned to a school as a school resource officer (SRO). In that case, the SRO observed a student with a colored bandanna hanging from his pocket, a violation of school rules and an indication of possible imminent gang activity. After the student refused the SRO's request to remove the bandanna, the SRO removed it and decided to take the student to the principal's office for discipline. Prior to doing so, the SRO performed a patdown search on the student for weapons because of the student's nervous demeanor and out of concern for school safety. The patdown search turned up a knife. (Id. at pp. 1467-1468.) The defendant argued that the SRO was not a school official and, therefore, the T.L.O. standard should not apply. (William V., at p. 1468.) William V. reasoned there should be no distinction between a non-law-enforcement security officer employed by a school district and a police officer assigned to a school as an SRO. (Id. at p. 1471 ["This distinction focuses on the insignificant factor of who pays the officer's salary, rather than on the officer's function at the school and the special nature of a public school."].) Thus, the search of a student by a police officer assigned as an SRO, conducted on school grounds, was subject to the reasonable suspicion standard under T.L.O. (William V., at pp. 1469-1472.)
Arguably, William V., where the police officer/SRO decided on his own to conduct a search, involves a greater level of police involvement than a case such as this, where a police officer calls the vice-principal, relays certain information and leaves to the vice-principal the decision whether or not to search. It is noteworthy that the police role in the search of appellant was at all times clearly subordinate to the role of the vice-principal, who made the decision to search and conducted the search. For that reason, the T.L.O. standard applies.
Appellant points to the police role in providing the information supporting the search and to the presence of officers at the search as bases for rejecting the T.L.O. standard. We disagree. First, it would be senseless for the propriety of the search to depend upon whether an informant called vice-principal Dolid directly or, instead, called a police officer, who relayed the information to Dolid. The officer's involvement as a mere information conduit does not change the balance of interests that led to the decision in T.L.O. Neither Harrison nor Cabral advised, instructed, or directed Dolid to conduct the search; they merely provided the information that she independently evaluated. It is noteworthy that before conducting the search, Dolid learned that appellant was in a P.E. class and his pants could be searched without compelling him to disrobe or be subject to a patdown search. Thus Dolid gathered additional information before acting on the informant's tip. (See In re D.E.M. (1999) 1999 PA Super 59 [727 A.2d 570, 574].)
*81 (4) Second, Harrison's presence during Dolid's search should not change the result. So long as the school official independently decides to search and invites law enforcement personnel to attend the search to help ensure the safety and security of the school, it would be unwise to discourage the school official from doing so, at least where it is reasonable to suspect that contraband inimical to a secure learning environment is present.
No California case involves facts precisely the same as our own. Numerous out-of-state cases discuss school searches in which the police have provided the information justifying the search or been present during the search. There is no consensus as to whether the T.L.O. standard applies in such circumstances. (See Van Dyke & Sakurai, Checklists for Searches and Seizures in Public Schools (2009-2010 ed.) § 10.4.) We note two cases we find instructive. In State v. McKinnon (1977) 88 Wn.2d 75 [558 P.2d 781] (McKinnon),[5] the local police chief received a call from a confidential informant that two high school students were selling "speed," which was located in their pockets. The police chief contacted the students' high school principal and related the informant's information. The principal said he would talk to the students and get back to the police chief. The principal summoned one student (Yates) into the principal's office and, simultaneously, the vice-principal summoned the other student (McKinnon) into the vice-principal's office. When Yates emptied all but one pocket in response to the principal's request to empty all his pockets, the principal reached into that pocket and recovered pills. The principal then entered the vice-principal's office, reached into McKinnon's pocket, and found pills. The pills found on the students were later determined to be amphetamines. Thereafter, the principal called the police chief, who went to the school and arrested the students. (558 P.2d at pp. 782-783.) The students contended that even if, in general, a school official could conduct a search on reasonable grounds, the particular searches of the students were invalid because they were "instigated" by the police chief. (Id. at p. 785.)
McKinnon noted that joint action by a law enforcement officer and a private person may constitute "police action," but concluded there was no joint action in that case. The decision noted that the police chief never instructed the principal to search the students or detain them, and never directed or even suggested to the principal that a search should be conducted. Instead, the police chief "merely relayed the information he had received to the principal, and the principal then acted independently" in contacting the students. (McKinnon, supra, 558 P.2d at p. 785.) The court stated, "[t]he fact *82 that the principal called the chief of police after conducting the search does not indicate complicity. If the principal had received this information from sources other than the police, he then would be under a duty both to conduct a search and notify the police of his discoveries. We find no difference here where the information was merely relayed to the principal by the chief of police." (Ibid.)
More recently, Vassallo v. Lando (E.D.N.Y. 2008) 591 F.Supp.2d 172 (Vassallo), concluded that the reasonable suspicion standard applied to a search of a high school student conducted by high school authorities in conjunction with law enforcement agents. The school authorities made the initial decision to interview and search a student suspected of arson, and then called the local police to assist them after the student refused to consent to a search, which ultimately turned up marijuana. (Id. at pp. 179-182, 194.) Vassallo found there was no evidence that the school officials' actions were used as a pretext by the police officer to circumvent the warrant and probable cause requirements. Instead, the decision to search was made by the school officials, and the police officer was merely assisting the school in conducting the search. It concluded that, because the school officials initiated the search pursuant to the school's interest in "`maintaining a safe learning environment' and requested the assistance of a law enforcement agent in furtherance of that goal," the reasonableness standard applied to review the search. (Id. at p. 194.) "To hold otherwise would potentially discourage school administrators from seeking the assistance and expertise of the police in a school's effort to address criminal and potentially dangerous situations that may be rapidly unfolding on school property." (Ibid.)
Appellant relies primarily on two out-of-state cases which preceded T.L.O. and imposed a probable cause standard for a search of a student in circumstances quite different from our own. Picha v. Wielgos (N.D.Ill. 1976) 410 F.Supp. 1214 (Picha)[6] involved a trial court order denying a motion for a directed verdict in a federal civil rights action under title 42 United States Code section 1983. In Picha, a school principal received a telephone call leading him to suspect that three students possessed illegal drugs. The principal was advised by his superintendent to call the police, and he did so. When the police arrived the three students were separately searched by the school nurse and school psychologist. (Picha, at p. 1216.) No drugs were found, and the lawsuit followed. The court noted that a school, acting on its own, has an interest in the safety of its students, and in furtherance of that interest, the school may locate and confiscate drugs; any evidence reasonably obtained may be usable in a criminal prosecution or juvenile delinquency proceeding. Because the court concluded that the police were not summoned *83 merely to further the school's interest in school safety, the court did not decide what standard would be appropriate if they had been summoned for that purpose. (Id. at p. 1221 & fn. 3 [since the police caused the search to find evidence of a crime, the "substantial state interest in the provision of education and the maintenance of school discipline cannot be here said to temper the application of the Constitution to [the] search"].) Thus, Picha is inapposite. The court expressly declined to set the standard for a search where, as here, the trial court has concluded that the police presence was designed to further the school's interest in a secure learning environment.
In M.J. v. State (Fla.Dist.Ct.App. 1981) 399 So.2d 996 (M.J.), a pre-T.L.O. case, three students told a high school assistant principal (Black) that they saw the defendant with a bag of marijuana in his underwear. Black called the police and Officer York came to Black's school office. Accompanied by York, Black questioned the defendant for 10 minutes and demanded he produce the marijuana. Black and York also threatened that the defendant would be "`taken down'" and arrested and they would call the defendant's uncle, a police officer. The defendant then agreed to let Black search him and produced a marijuana cigarette from his pocket. Black accused the defendant of having more marijuana and York said he would call the defendant's uncle and that a search could be conducted. Then Black told the defendant to pull down his pants and the defendant complied and then pulled a bag of marijuana from his underwear. (Id. at p. 997.) York "strongly suggested" the defendant turn over the marijuana. (Ibid.) York's role in the search in M.J. was far more substantial than the police role in our case. Nothing in M.J. suggests that York served in a subordinate capacity to Black during the search or was present merely to ensure school safety. Thus M.J. provides little help to appellant.[7]
(5) Certainly, the extent of the police role in a student search at a school will govern whether the T.L.O. standard applies. In making this determination, the totality of the circumstances must be examined. (See T.L.O., supra, 469 U.S. at p. 341; see also Burdeau v. McDowell (1921) 256 U.S. 465 [65 L.Ed. 1048, 41 S.Ct. 574] [in deciding if a private person is acting as a police agent and, therefore, subject to the 4th Amend., a totality of the circumstances test is applied].) When it denied appellant's motion to suppress, the trial court stated, "I'm going to find in this case that there was a reasonable suspicion, that the search was carried out by [a] school official who testified today, that she was doing so because of a concern for the safety of the school .... [¶] I find that the ... source for the search was a corroborated source." (6) Implicitly, the trial court found that Dolid made the decision to search and to have the officers present during the search, and *84 each decision was designed to protect "the safety of the school." Because substantial evidence supports the trial court findings, we affirm its conclusion that the T.L.O. standard applies.

III.-V.[*]

DISPOSITION
The maximum confinement term contained in the clerk's February 19, 2009 minute order is stricken. The order is otherwise affirmed.
Needham, J., and Bruiniers, J., concurred.
NOTES
[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I, III, IV, and V.
[1] The facts are derived from the suppression hearing.
[2] The record refers to Dolid as "Harter."
[*] See footnote, ante, page 72.
[3] Because the search in William G. occurred before the passage of Proposition 8, which amended the California Constitution in 1982 (In re Lance W. (1985) 37 Cal.3d 873, 879 [210 Cal.Rptr. 631, 694 P.2d 744]), the William G. court rested its decision on both state and federal law (William G., supra, 40 Cal.3d at pp. 557-558, fn. 5).
[4] In a footnote, the court noted that because the school security officers who seized a knife from the detained student did not act as law enforcement officers, it declined to consider what standard should apply to seizures conducted by school officials "in conjunction with or at the behest of law enforcement agencies." (Randy G., supra, 26 Cal.4th at p. 569, fn. 3, citing T.L.O., supra, 469 U.S. at p. 341, fn. 7.)
[5] Although McKinnon predated T.L.O., the Washington Supreme Court applied the same reasonable suspicion standard in addressing the propriety of a search of a student by a school official. Moreover, McKinnon is cited with approval by the United States Supreme Court in T.L.O. (T.L.O., supra, 469 U.S. at pp. 332-333, fn. 2, 341, fn. 6.)
[6] Picha is cited in dicta in T.L.O. as "holding probable-cause standard applicable to searches involving the police." (T.L.O., supra, 469 U.S. at p. 341, fn. 7.)
[7] In State v. D.S. (Fla.Dist.Ct.App. 1996) 685 So.2d 41, 43, the court concluded that M.J. was inconsistent with T.L.O. and "does not correctly state the law."
[*] See footnote, ante, page 72.