Filed 5/14/2014 Unmodified opinion attached
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re J.D., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>J.D.,<br><br>    Defendant and Appellant. | A138584<br><br>(Contra Costa County<br>Super. Ct. No. J1101036)<br><br>ORDER MODIFYING<br>OPINION AND DENYING<br>REHEARING<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the published opinion filed herein on April 15, 2014, be modified as follows:

1A.  On page 1, the fourth sentence in the first paragraph of the opinion is deleted and replaced with the following sentence:

He now appeals the court's ruling on the suppression motion and challenges various conditions of his probation.

1B.  On page 1, after the sixth and last sentence in the first paragraph, the following text is added:

We also modify appellant's probation conditions.  As modified, the judgment is affirmed.

1

2. On page 12, after the last paragraph of the "**DISCUSSION**" section, which states "The motion to suppress was properly denied," and before the heading "**DISPOSITION**," the following text is added:

Appellant also challenges the validity of his probation conditions. After placing appellant on probation in his uncle's home, the court stated: "You're not to change your residence without prior approval of the probation officer and must notify change [sic] of address or phone number within five days." The trial court has wide discretion in imposing reasonable conditions of juvenile probation (Welf. & Inst. Code, § 730, subd. (b)), including conditions which enable the court to determine the ward's place of residence to ensure he or she is residing in a stable environment that promotes rehabilitation. However, we agree with appellant this condition is not narrowly tailored to avoid the possible impingement on his right to travel. (Cf. *In re Sheena K.* (2007) 40 Cal.4th 875 [probation condition prohibiting minor from associating with disapproved persons unconstitutionally vague].) We therefore modify the condition to provide that if defendant changes residence, he is to notify the probation officer of his change of address and phone number within five days.

The court also forbade appellant to use or possess drugs, alcohol, weapons, or ammunition. Appellant argues these conditions do not give him fair warning or adequate notice of what is prohibited because "weapon" is not defined and there is no express scienter requirement. (*In re Sheena K., supra*, 40 Cal.4th at pp. 890-892.) We agree. A person may be involuntarily drugged or intoxicated, or unknowingly in constructive possession of weapons or ammunition. Furthermore, the term "weapon" may include ordinary objects if used to inflict injury. In order to avoid any ambiguity, we modify the court's prohibition to make clear that appellant is not to *knowingly* use or possess drugs, alcohol, dangerous or deadly weapons, or ammunition.

3. On page 12, after the heading "**DISPOSITION,**" the following sentence is deleted: "The judgment is affirmed." The following text is added:

2

The trial court's order imposing conditions of probation is modified as follows: (1) if appellant changes residence, he is to notify the probation officer of his change of address and phone number within five days; and (2) appellant is not to knowingly use or possess drugs, alcohol, dangerous or deadly weapons, or ammunition. As modified, the judgment is affirmed.

This modification is not to be published, except for the modified text on page 1 of the opinion (see paragraph nos. 1A and 1B, above) and the text added to page 12 of the opinion after "**DISPOSITION**" (see paragraph no. 3, above).

This modification does not change the judgment.

The petition for rehearing is denied.

_____
Dondero, J.

3

Filed 4/15/14 Unmodified opinion

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re J.D., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> J.D., <br><br> Defendant and Appellant. | A138584 <br><br> (Contra Costa County Super. Ct. No. J1101036) |

In this appeal, we are asked to review the denial of a motion to suppress in a delinquency proceeding. Appellant's locker was searched by high school security and a sawed-off shotgun was found in his backpack. The trial court upheld the search. Following a jurisdictional hearing, the court sustained count one of the wardship petition alleging the minor possessed a firearm in a school zone, a felony (Pen. Code, § 626.9, subd. (b)), and dismissed two other counts on the People's motion. He now appeals the court's ruling on the suppression motion. His appeal is authorized by Welfare and Institutions Code section 800. We conclude the conduct undertaken by school security was reasonable and sustain the trial court's decision.

### STATEMENT OF FACTS

Charles Johnson was a campus security officer (CSO) for the West Contra Costa Unified School District (WCCUSD). At the time of the offense, he was assigned to Richmond High School, a part of the WCCUSD. On February 10, 2011, while on duty at

the school, Johnson was approached by a female student who seemed concerned and wished to speak with Rose Sanders, another CSO at Richmond High School. Johnson accompanied her to see Sanders. A short while later, Johnson was called to Sanders's office to hear what the student had to say. The student related that on the day before, while the student was on an AC Transit bus, a Richmond High School student, T.H., pulled out a gun and shot someone. The student witness had been on the bus and indicated another student told her what T.H. had done with the weapon.

T.H. was currently enrolled at Richmond High School. Sanders wanted to know if T.H. was on campus and if he had a weapon on the premises. Johnson met with school administrators and was directed to detain T.H. and determine if he had any weapon.

Johnson proceeded to the security office on campus to call Richmond police for help. When he arrived, Sergeant Russell of the Richmond Police Department was present for a visit. Russell told Johnson to locate T.H. but not confront him. Russell also advised Johnson to determine where T.H.'s locker is located.

To follow up on identifying T.H.'s locker, Johnson met with CSO Driscoll, the campus security officer who "deals with [student] lockers." Each year, Driscoll re-keys the lockers and changes the combinations. While he does not assign lockers to individual students, Driscoll had information about who was assigned to particular lockers. Driscoll also is responsible for supervising the cleaning out of school lockers during the year and handling repair of jammed lockers. When Driscoll noticed the assigned locker of T.H., he told Johnson that was not the locker he "hangs around." Driscoll related he had seen T.H. several times in the area of locker number 2499. On the day of the reported shooting, Driscoll had observed T.H. with his girlfriend in front of locker 2499. The couple was facing the set of lockers but Driscoll was not able to determine which one, if any, they might be using. This behavior seemed suspicious to Driscoll. The incident occurred when students were required to be either in class or at lunch but not in the hall area where T.H. was seen.

2

During their conversation, Driscoll advised Johnson that Richmond High students often shared their assigned locker with other students who were not assigned to that locker for the purpose of concealing contraband such as drugs and other items not permitted on campus. The CSO's were familiar with this behavior at the school.

Driscoll and Johnson along with Russell went to the area of locker 2499 to see if weapons were present. When opened, locker 2499 contained a couple of books, but nothing else. Russell then told Driscoll to check the adjacent lockers because the student had frequented the "area" of 2499. Shortly, Driscoll opened 2501, which was next to 2499. A backpack was found in it and, when removed from the location, the security officers noticed the butt of a sawed-off shotgun.

As these men were inspecting this group of lockers, other personnel had located T.H. on campus. He was discovered and surveilled as Driscoll, Johnson and Russell began inspecting the lockers in the area of 2499.

At the approximate time of this search, Sergeant Robert Gray of the Richmond Police Department was on campus based on the shooting report. Gray and another officer found T.H. on the campus and confronted him. While T.H. personally had no weapon, he was asked by the officers about a weapon. T.H. stated he had a handgun in his backpack, which was near him. This was verified by the officers checking the backpack.

Regarding the backpack found in locker 2501, in addition to the sawed-off shotgun, the school investigators found miscellaneous papers in the backpack belonging to minor J.D. These papers containing the minor's name included school assignment papers. Eventually, Gray met with the minor. He was *Mirandized* by the officer. The minor acknowledged a waiver of his rights. He admitted the shotgun belonged to him. The minor stated he had been bothered by other students at Richmond High School and possessed the weapon for his safety at the school.

DISCUSSION

Recent events have demonstrated the increased concern school officials must have in the daily operation of public schools.  Sites such as Columbine, Sandy Hook Elementary, and Virginia Tech have been discussed in our national media not because of their educational achievements, but because of the acute degree of violence visited on these and other campuses— hostility often predicated on killings with firearms.  During the 2009-2010 school year, 33 students, staff, and others died in a school-associated violent event.[1]  In 2009, 8 percent of students in grades nine through twelve reported being threatened or injured with a weapon on school property at least one time.[2]  According to the National Center for Injury Prevention and Control, a division of the Center for Disease Control (CDC), in 2010, there were 828,000 nonfatal victimizations at school among students 12 through 18 years of age.  In 2011, 5.9 percent of the students in grades nine through 12 did not attend school within 30 days of the CDC survey because they felt the school, or their way to or from school, was unsafe.  Also, 7.4 percent of the same group reported being threatened or injured with a weapon on school property one or more times in the past 12 months before the survey.[3]  We must be cognizant of this alarming reality as we approach our role in assessing appropriate responses by school administrators to campus safety issues.

Education "is perhaps the most important function" of government.  (*Brown v. Board of Education* (1954) 347 U.S. 483, 493.)  As such, "government has a heightened obligation to safeguard students whom it compels to attend school.  The special need for

---

[1] National Center for Education Statistics, U.S. Department of Education, Bureau of Justice Statistics, U.S. Department of Justice, Indicators of School Crime and Safety (2011) Key Findings: Violent Deaths, p. iii.
[2] National Center for Education Statistics, U.S. Department of Education, Bureau of Justice Statistics, U.S. Department of Justice, Indicators of School Crime and Safety (2011) Indicator 4: Threats and Injuries With Weapons on School Property, p. 18.
[3] National Center for Injury Prevention and Control, Center for Disease Control. Understanding School Violence: Fact Sheet (2012) p. 1.

an immediate response to behavior that threatens either the safety of schoolchildren and teachers or the education process itself justified the Court in excepting school searches from the warrant and probable-cause requirement, and in applying a standard determined by balancing the relevant interests." (*New Jersey v. T.L.O.* (1985) 469 U.S. 325, 353 (conc. opn. of Blackmun, J.) (*T.L.O.*).) Of course, it is a given that students do not "shed their constitutional rights . . . at the schoolhouse gate." (*Tinker v. Des Moines Independent Community School District* (1969) 393 U.S. 503, 506.) Yet "the 'primary duty of school officials. . . is the education and training of young people. A State has a compelling interest in assuring that the schools meet this responsibility. Without first establishing discipline and maintaining order, teachers cannot begin to educate their students.' " (*In re Randy G.* (2001) 26 Cal.4th 556, 562 (*Randy G.*).) After all, all minor students are required to be in school. (Ed. Code, § 48200.) And "All students and staff of public primary, elementary, junior high, and senior high schools . . . have the inalienable right to attend campuses *which are safe, secure and peaceful.*" (Cal. Const., art. 1, § 28, subd. (f)(1); italics added.) Among the ways school districts achieve this is by having security departments in the school to enforce the rules of the State and school district. (Ed. Code, § 38000; *Randy G.*, *supra*, 26 Cal.4th at pp. 562-563.)

To properly employ the balance between the privacy interests of public school children with the important need to maintain order and discipline in schools today, the accommodation does not require rigid adherence to the requirement that searches be based on probable cause to believe the subject of the search has violated or is violating the law. Instead, the validity of a search on school property should depend on the reasonableness of the official conduct to deal with the particular school problem. (*T.L.O., supra,* 469 U.S. at p. 341.) "Events calling for discipline are frequent occurrences and sometimes require immediate, effective action." (*Goss v. Lopez* (1975) 419 U.S. 565, 580.) Therefore, school administrators and security personnel need to have "a certain

5

degree of flexibility in school disciplinary procedures . . . ." (*T.L.O., supra,* 469 U.S. at pp. 582-583.)

In normal situations, any search or seizure requires an individualized suspicion of criminal activity.  (*Brinegar v. United States* (1949) 338 U.S. 160, 175.) Without such, the search is not reasonable and violates the Fourth Amendment.  (*Randy G., supra,* 26 Cal.4th at p. 565.)  However, the Fourth Amendment protections are rooted always in reasonableness—individualized suspicion triggers reasonable inquiry by the police in the usual case.  Yet over time, the reasonableness of any search must be reflective of a balance between the particular intrusion on a person's Fourth Amendment interests against its promotion of *legitimate* governmental interests.  (*Vernonia School District 47J v. Acton* (1995) 515 U.S. 646, 652-653 (*Acton*).)  Neither a warrant nor probable cause is inevitably required "when '*special needs* [exist] beyond the normal need for law enforcement to make the warrant and probable-cause requirement impracticable.' " (*Griffin v. Wisconsin* (1987) 483 U.S. 868, 873, italics added.)  This "special needs" rationale has allowed the Supreme Court to require drug testing of customs officials at the border (*National Treasury Employees Union v. Von Raab* (1989) 489 U.S. 656, 665-666 (*Von Raab*)) and railway workers (*Skinner v. Railway Labor Executives' Assn.* (1989) 489 U.S. 602, 619-620 (*Skinner*).)

The reasonableness assessment based on special needs has been deemed appropriate in public schools by the Supreme Court.  "We have found such 'special needs' to exist in the public school context. There, the warrant requirement 'would unduly interfere with the maintenance of the swift and informal disciplinary procedures [that are] needed,' and 'strict adherence to the requirement that searches be based upon probable cause' would 'undercut the substantial need of teachers and administrators for freedom to maintain order in the schools.' " (*Acton, supra,* 515 U.S. at p. 655, citing *T.L.O., supra,* 469 U.S. at p. 341.)

6

Of course, there is the need to recognize and consider individual student rights in this review. Against the strong governmental interest or special need in the public school arena, the courts have developed the need to focus not on individualized suspicion, but on the circumstances triggering administrative action and whether the execution is arbitrary, capricious, or for the purpose of harassment. (*Randy G., supra,* 26 Cal.4th at p. 567.) While *Randy G.* involved only the detention of a student in a public school, its reasoning has been adopted in campus search cases as well. (*In re Sean A.* (2010) 191 Cal.App.4th 182, 188-189; *In re K.S.* (2010) 183 Cal.App.4th 72, 79; see also, *In re Latasha W.* (1998) 60 Cal.App.4th 1524, 1527.)

In our case, the administration and its security staff at Richmond High School faced a report from an identified student who overheard that, the previous day, one of the school's students, T.H., shot another person on a bus after school. The student reportee demonstrated concern over the incident and was interviewed by CSO Sanders and also CSO Johnson. This information triggered two responsible initiatives by the school security officers. The first was to determine if T.H. was on the school property with a weapon. The second was to inspect lockers that could be used by T.H. to conceal such an item. Neither step by the school would be considered inappropriate or unreasonable. Each was narrow and focused, and based on the identity of T.H. and an area of the school he was known to frequent.

The belief that T.H. may have stored contraband in another person's locker, in the context of the special needs doctrine, does not serve to preclude the action of school security. Even if another student validly had the assigned use of a particular locker at the school, that fact did not make the official behavior here suspecting an alleged shooter also had access to the same lockers unreasonable. Privacy concerns needed to be balanced against the official need to address school safety. The principles developed in *T.L.O., Acton,* and *Board of Education of Independent School District No. 92 of Pottawatomie County v. Earls* (2002) 536 U.S. 822 *(Earls)*, as well as *Skinner* and *Von*

7

*Raab,* are authoritative precedent here because they also involve a proactive policy based on government obligations aimed at protecting students, travelers, and our national borders, not hindsight reflection.

This assessment of reasonableness requires judicial review of its quality and the behavior by school officials at the outset of official reaction. "[T]he legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search. Determining the reasonableness of any search involves a twofold inquiry: first, one must consider 'whether the . . . action was justified at its inception,' [Citation]; second, one must determine whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place,' [Citation]. Under ordinary circumstances, a search of a student by a teacher or other school official will be 'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school. Such a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and are not excessively intrusive in light of the age and sex of the student and the nature of the infraction." (*T.L.O, supra,* 469 U.S. at pp. 341-342, fns. omitted.)

The cases that apply special needs factors to the public school have allowed random practices by school officials because they are a reasonable way to handle school problems. In *Acton,* the Court approved random urine testing of students who participated in school athletic programs. A refusal to supply a urine sample precluded participation in the District football program. (*Acton, supra,* 515 U.S. 646, 651.) The District's approach was an appropriate way to deal with campus drug issues deemed serious by the administration. (*Id.* at pp.664-665.) The policy also served to lessen liability concerns with sports-related injuries. (*Id.* at p. 649.) No individualized suspicion or probable cause was necessary for the test. (*Id.* at pp. 664-665.)

8

In *Earls,* the Court upheld a drug testing policy for all students who participated in any competitive extracurricular activity in the school district. "[I]n the context of safety and administrative regulations, a search unsupported by probable cause may be reasonable 'when "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." ' " (*Earls, supra,* 536 U.S. 822, 829.) " 'Fourth Amendment rights . . . are different in public schools than elsewhere; the "reasonableness" inquiry cannot disregard the schools' custodial and tutelary responsibility for children.' " (*Id.* at p. 830.)

Other jurisdictions have dealt with locker searches on school property in the same fashion we do today. The case of *In re Patrick Y.* (2000) 358 Md. 50 dealt with an unidentified source advising a school security officer there were drugs and weapons in the "middle school area" of Mark Twain School. (*Id.* at p. 53.) The principal directed that all lockers in the "middle school area" be searched. As a result, inside Patrick's locker was located an illegal folding knife and a pager---both items forbidden on school property. (*Ibid.*) There was no original focus on Patrick in this case. All lockers in the middle school were opened and inspected. Under school policy, lockers were assigned to individual students and, because they are the property of the school, subject to inspection by school officials. (*Id.* at p. 63.) Any interest individual students had in the contents of assigned lockers was secondary to the school administration's obligation. Under *Acton,* " 'when the government acts as guardian and tutor the relevant question is whether the search is one that a reasonable guardian and tutor might undertake' and . . . the answer [is] in the affirmative." (*Patrick Y., supra*, 358 Md. at p. 60, quoting *Acton, supra*, 515 U.S. at p. 665.)

The Iowa Supreme Court followed the reasoning in *Acton* and *Earls* when it upheld locker searches in *State v. Jones* (2003) 666 N.W.2d 142. In the case, Muscatine High School advised 1,700 students that they should clean out lockers before winter break. (*Id.* at p. 144.) Approximately 1,400 of the students did so. However, a sizable

number did not. Two school aides went through each locker that was not emptied and inspected the contents. The aides were checking for school property but also drugs and weapons. (*Ibid*.) In Jones's locker, they found a nylon jacket which, upon close inspection, had marijuana in a pocket. This seized evidence was not suppressed because the conduct by school aides was reasonably based. (*Id.* at p. 150.) "We believe the locker search conducted by the school officials in this case is most closely analogized to the broad searches conducted in *Acton* and *Earls*. Although this search eventually focused on Jones'[s] locker, the process leading to that point was random and carried out with the purpose of protecting the health and safety of the whole student body to preserve a proper educational environment." (*Id.* at p. 146.) In the end, the Court found that even if Jones had a legitimate expectation of privacy in the contents of his locker, "that privacy may be impinged upon for reasonable activities by the school in furtherance of its duty to maintain a proper educational environment." (*Id.* at p. 150.)

A final case for discussion is *Commonwealth v. Carey* (1990) 407 Mass. 528. There, an assistant principal was told by another teacher about a report that teacher received from two students. The students had seen Carey, a student, on school property brandishing a weapon that morning. (*Id.* at p. 529.) The administrator and a police officer searched Carey's locker without his knowledge and found a jacket containing a gun. (*Id.* at p. 530.) The evidence disclosed the school had an unannounced policy of checking student lockers for contraband if they received a report meriting such inquiry. Students at the school were not notified of this option. (*Id.* at p. 530.) However, the Massachusetts Supreme Court found whether an announced policy existed was not relevant in this case. "[W]e pass over the expectation of privacy issue because we conclude that the warrantless search of the locker was in any event justified under the Fourth Amendment." (*Id.* at p. 533.) Following *T.L.O.*, the Court observed "a school administrator's task of maintaining discipline in the school has become a more difficult one, as 'in recent years, school disorder has often taken particularly ugly forms: . . .

10

violent crime[s] in the schools have become major social problems.' " (*Commonwealth v. Carey, supra*, at pp. 533-534, quoting *T.L.O*, *supra*, 469 U.S. at p. 339.) The search of Carey's locker was "clearly based on common sense, and was reasonable both at its inception and in its scope." (*Commonwealth v. Carey*, *supra,* at pp. 533-534.)

Importantly, in our case we are not reviewing the established policy of a district to engage in widespread conduct affecting many students. Instead, we are dealing with a shooting by a Richmond High School student on a public bus the previous day who was believed to be on school grounds on the day in question. Our matter called for the flexible but reasonable response demonstrated by school administrators and staff in the out-of-state cases cited above. The decision to detain the alleged shooter and check particular places on the campus T.H. frequented is a more limited response than the established practices condoned in *Acton* and *Earls*. The reasonable response here was not prolonged over time nor a widespread checking of all lockers at Richmond High School. The locker 2501 that was adjacent to the first locker checked, 2499, was properly examined based on the observations of CSO Driscoll, his experience with student concealment of items in other lockers, and the prompt need to address a serious shooting the previous day. The fact that minor J.D., rather than T.H., had stored an illegal weapon in locker 2501 should not disturb the legal validity of this search.

In addition, we have no concern based on these facts that Richmond police officers assisted the school security personnel in carrying out this inquiry. The facts indicate the initial report was presented by known students to CSO Johnson and Sanders. In their role as security officers acting at the behest of Richmond High School administrators, they acted in the interests of campus safety. Johnson did advise Sergeant Russell of the Richmond Police Department, and that officer accompanied Johnson and Driscoll as they went to the area of lockers 2499 and 2501. It is also true Russell contacted his two fellow officers to come to the school, locate T.H., and confront him. But the secondary role of

11

the police officers does not cancel the fundamental feature of this case—administrators seeking to secure the school premises from potential for violence.

In *In re K.S.* (2010) 183 Cal.App.4th 72, Division Five of this district reviewed the denial of a motion to suppress. Police informed the campus resource officer, who was also a Livermore policeman, about a confidential tip that a student at the school possessed Ecstasy drugs. The resource officer advised the vice principal. While the suspect was in gym class, the vice principal along with the officer who relayed the report to the campus resource officer went to the locker of K.S. to check street clothing stored inside the locker. The school vice principal did not seek police permission. She wanted to see if the drugs were on the campus. Inside the pockets of the pants were several Ecstasy tablets. Later, K.S was arrested. In approving the search, the court followed *T.L.O.* Regarding the part the officers played in this search, the opinion focused on the school administrator's role in the search. "It is noteworthy that the police role in the search of appellant was at all times clearly subordinate to the role of the vice-principal, who made the decision to search and conducted the search. For that reason, the *T.L.O.* standard applies." (*Id.* at p. 80; see also *In re William V.* (2003) 111 Cal.App.4th 1464, 1469-1472.)

The motion to suppress was properly denied.

## DISPOSITION

The judgment is affirmed.

_____
Dondero, J.

We concur:

_____
Margulies, Acting P. J.

_____
Becton, J.*

---

* Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Trial Court:                                    Contra Costa County Superior Court


Trial Judge:                                    Hon. Barry Baskin


Counsel for Defendant and Appellant:            Eileen A. Manning-Villar,
                                                   under appointment by the
                                                   Court of Appeal


Counsel for Plaintiff and Respondent:           Ronald E. Niver
                                                   Deputy Attorney General

                                                Kamala D. Harris
                                                   Attorney General of California
                                                Dane R. Gillette
                                                   Chief Assistant Attorney General
                                                Gerald A. Engler
                                                   Senior Assistant Attorney General
                                                Eric D. Share
                                                   Supervising Deputy Attorney General