Filed 4/11/16 In re Diego V. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re DIEGO V., a Person Coming Under the Juvenile Court Law.<br><br>THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DIEGO V.,<br><br>    Defendant and Appellant. | G050939<br><br>(Super. Ct. No. DL049307)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Richard Y. Lee, Judge. Affirmed.

Jan B. Norman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland, Kimberley A. Donohue and Christopher Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

The juvenile court found true allegations Diego V. committed five acts of misdemeanor vandalism (Pen. Code, § 594, subds. (a), (b)(1)), declared him a ward of the court (Welf. & Inst. Code, § 602), set a 28-month maximum period of incarceration, and placed him on home probation.

Diego challenges the court's denial of his motion to suppress evidence. (Welf. & Inst. Code, § 700.1.)  We affirm the court's ruling and judgment.

## FACTS

A Welfare and Institutions Code section 602 petition alleged Diego committed five acts of vandalism after a school administrator found evidence linking him to vandalism at Garden Grove High School in a fellow student's locker.  When questioned, Diego admitted vandalizing the high school.  He also admitted vandalizing four pieces of property owned by the City of Garden Grove.

Diego's motion to suppress asserted the inculpatory evidence was obtained by "[t]he non-consensual detention of Minor's person" and "illegal conduct by the government."  The district attorney asserted the school administrator searched the other student's locker based on a reasonable suspicion it would contain evidence of vandalism.

At the hearing on the motion to suppress, Thomas Duggan, a 14-year veteran assistant principal at Garden Grove High School, testified that school policy requires every student to sign a written agreement to obtain a locker.  Students are not permitted to share lockers, unless both students have signed an agreement, and they are informed of this policy through class announcements and flyers, and Duggan's annual speech about school rules.  Duggan found that students tend to use each other's lockers to conceal contraband.

Another aspect of Duggan's job involves the investigation of school rules and law violations.  Vandalism occurs on an almost weekly basis, and Duggan investigates between 10 and 15 incidents of vandalism on school property every year.  He was very familiar with a variety of graffiti forms and tagging.

2

On Saturday, December 14, 2013, someone wrote the word "KING" on a United States Postal Service (USPS) priority mail sticker and posted the sticker on a wall in one of the boys' bathrooms. Duggan referred to this type of vandalism as a "slap tag."

The following Monday, Duggan identified the students who were on campus the previous Saturday. Duggan compared this list with a list of known taggers and happened to see a USPS priority mail sticker on a female student's notebook. The sticker had the name "Juan S[.]" written on it. The student told Duggan the sticker came from Juan, and as it turned out, Juan had been on campus the previous Saturday.

Duggan checked for and found a locker agreement for Juan before he located and searched Juan's assigned locker. Duggan testified he was looking for "anything related" to the December 14 vandalism. As Duggan searched through Juan's locker, he found Juan's school planner with a USPS sticker, "same colors, same writing," as the December 14 slap tag emblazoned with Juan's name.

As Duggan continued to flip through the contents of Juan's locker, he discovered several notebooks. In addition to Juan's belongings, Duggan found a letter-sized notebook bearing Diego's name. On an inside page, Duggan found the letters, "FUAK" in a familiar graffiti style. Duggan testified that on Saturday, November 16, someone had written FUAK in permanent marker on the wall of the boys' locker room.

Duggan, who now suspected Diego might be involved in campus graffiti and vandalism, removed some pages from the notebook, including the FUAK page and a page with another familiar symbol, the graffiti letters "ENTA." He compared the images from Diego's notebook to computer images of the November vandalism. They were similar enough that Duggan decided to question Diego.

Duggan had Diego brought to his office. He showed Diego the FUAK page, told Diego he was calling the police, and advised Diego to tell the truth because lying to a police officer is a separate crime. After that, Diego admitted writing FUAK on the boys' locker room wall.

3

When Garden Grove Police Officer Gary Elkins arrived at school, Diego verbally repeated his admission and provided a handwritten confession. Elkins collected the pages from Diego's notebook, his handwritten confession, and a picture of the November 16 graffiti, and he arrested Diego for vandalism.

Elkins handcuffed Diego and took him to the Garden Grove Police Department's Juvenile Justice Center. Diego received a *Miranda* (*Miranda v. Arizona* (1966) 384 U.S. 436) advisement, and he told Elkins that he understood his rights and wanted to waive them. Diego then told Elkins that FUAK was the name of a tagging crew in Garden Grove. He also told Elkins that he sometimes "tagged" alone, and Diego admitted using slap tags to put "signs in electrical boxes and property."

Elkins then showed Diego several pictures of graffiti from different parts of Garden Grove. Initially, Diego claimed responsibility for 10 to 20 acts of vandalism to city property, but he later recanted and reduced the number to five. As for the letters ENTA, Diego said that was just graffiti.

At the hearing on the motion to suppress, Diego's counsel argued Duggan's reasonable suspicion of Juan's complicity in a crime did not give Duggan grounds to open Diego's notebook. Diego's counsel asserted the Fourth Amendment required Duggan to "withdraw the notebook and call Diego into his office" before looking at any of the pages.

The court first questioned whether Diego maintained a reasonable expectation of privacy in a notebook he put in Juan's locker. Diego's counsel stated, "My argument would be yes, simply by the fact that he's put his name on the outside. Yes, can anybody go through the notebook . . . yes, but for argument sake here, by placing his name on the outside of the cover, he's identified it as his . . . ." As counsel explained, "I think once finding Deigo's notebooks and seeing he's in violation of a school policy, he could have collected the notebooks and talked to Diego. [¶] There was no need to go through specifically every single page of the notebook."

4

The district attorney asserted Duggan's search of Juan's locker was based on a reasonable suspicion Juan violated the law. "And beyond that, [Diego] no longer has complete control over that locker, so thus he's kind of on notice that the locker could be searched because of something Juan . . . does . . . ." Citing *In re J.D.* (2014) 225 Cal.App.4th 709 (*J.D.*), the district attorney asserted the search of Diego's notebook was justified by Duggan's reasonable suspicion Juan violated the law or a school rule. The court agreed, and Diego's motion was denied.

**DISCUSSION**

Diego asserts Duggan violated his Fourth Amendment rights by opening the notebook Diego left in Juan's locker. On appeal, we review the denial of a motion to suppress in the light most favorable to the court's ruling, deferring to the court's express or implied factual findings if supported by substantial evidence, but exercising our independent judgment to determine whether, on those facts, the search or seizure was reasonable under the Fourth Amendment. (*People v. Lomax* (2010) 49 Cal.4th 530, 563; *In re Sean A.* (2010) 191 Cal.App.4th 182, 186 (*Sean A.*); *In re Cody S.* (2004) 121 Cal.App.4th 86, 90 (*Cody S.*).)

Students in our public schools retain Fourth Amendment protection from unreasonable searches and seizures of their persons or property. (*New Jersey v. T.L.O.* (1985) 469 U.S. 325, 333-324 (*T.L.O.*); *In re William G.* (1985) 40 Cal.3d 550, 564 (*William G.*); *Sean A.*, *supra*, 191 Cal.App.4th at p. 186.) However, the "strict application of the principles of the Fourth Amendment as used in criminal law enforcement matters does not appropriately fit the circumstances of the operation" of public schools. (*Sean A.*, at p. 186.) As the California Supreme Court observed, "The public school setting is one in which governmental officials are directly in charge of children and their environs, including where they study, eat and play. Thus, students' zones of privacy are considerably restricted as compared to the relation of a person to the police—whether on the street or at home." (*William G.*, *supra*, 40 Cal.3d at p. 563.)

5

In practice, a public school student's legitimate expectation of privacy is balanced against the school's obligation to maintain discipline and to provide a safe environment for all students and staff. (Cal. Const., art. 1, § 28, subd. (f)(1); *Cody S.*, *supra*, 121 Cal.App.4th at p. 90.) This balancing does away with the probable cause and warrant requirements: "searches of students by public school officials must be based on a reasonable suspicion that the student or students to be searched have engaged, or are engaging, in a proscribed activity (that is, a violation of a school rule or regulation, or a criminal statute)." (*William G.*, *supra*, 40 Cal.3d at pp. 563-564; see also *T.L.O.*, *supra*, 469 U.S. at p. 324.) And, the reasonable suspicion standard "requires articulable facts, together with rational inferences from those facts, warranting an objectively reasonable suspicion that the student or students to be searched are violating or have violated a rule, regulation, or statute. [Citations.]" (*William G.*, at p. 564.)

Diego recognizes the reasonable suspicion standard, but argues Duggan needed an individualized suspicion Diego was involved in a crime or school rule violation *before* he opened Diego's notebook. We disagree for a couple reasons.

First, Duggan realized Diego had violated the school's locker-sharing policy the moment he saw Diego's notebook in Juan's locker. Under these circumstances, Diego's unauthorized locker sharing arguably justifies Duggan's continued search.

Second, in the school setting, individualized suspicion is not always necessary. "[S]chool officials 'are not in the business of investigating violations of the criminal laws . . . and otherwise have little occasion to become familiar with the intricacies of this Court's Fourth Amendment jurisprudence.' [Citation.] Those officials must be permitted to exercise their broad supervisory and disciplinary powers, without worrying that every encounter with a student will be converted into an opportunity for constitutional review. To allow minor students to challenge each of those decisions, through a motion to suppress or in a civil rights action under 42 United States Code

6

section 1983, as lacking articulable facts supporting reasonable suspicion would make a mockery of school discipline and order." (*In re Randy G.* (2001) 26 Cal.4th 556, 566 (*Randy G.*).)

For instance, in *Randy G.*, a campus security officer encountered the minor in an area where students were not allowed to congregate. (*Randy G.*, *supra*, 26 Cal.4th at p. 560.) The minor fidgeted with his pants pocket, so the security officer followed him and alerted another security officer. (*Ibid.*) Both security officers went to the minor's classroom, asked him to come out of class and into the hall, and then questioned him. (*Ibid.*) During the questioning, the security officers received the minor's consent to a patdown search. (*Ibid.*) The patdown search yielded a knife. (*Ibid.*)

The trial court denied the minor's motion to suppress, but the Court of Appeal reversed, agreeing with the minor that the proper standard under the circumstances "was whether 'the detaining officer has reasonable suspicion that the person to be detained has been, is, or is about to be engaged in criminal activity.' [Citation.]" (*Randy G.*, *supra*, 26 Cal.4th at p. 561.)

The California Supreme Court reversed, stating, "Although individualized suspicion is usually a prerequisite to a constitutional search or seizure, 'such suspicion is not an "irreducible' component of reasonableness.' [Citation.] Under the Constitution, the usual prerequisites can be modified when ""'special needs''" render those rules impracticable. [Citation.] 'Special needs' exist 'in the public school context.' [Citation.]" (*Randy G.*, *supra*, 26 Cal.4th at p. 565.) Consequently, the detention of minor students on school grounds is Constitutional so long as the detention was "not arbitrary, capricious, or for the purposes of harassment. [Citations.]" (*Id.* at p. 567.) In sum, "Reasonable suspicion—whether called 'particularized suspicion' [citation], 'articulable and individualized suspicion' [citation], 'founded suspicion' [citation], or 'reasonable cause' [citation]—need not be shown." (*Ibid.*)

In the context of a locker search, we find *J.D.*, *supra*, 225 Cal.App.4th 709 instructive. In *J.D.*, a female high school student told a campus security officer that she had seen another student, T.H., pull out a gun and shoot someone on a transit bus. (*Id.* at p. 712.) When the security officer learned T.H. hung around another student's locker, and that T.H. had been loitering in that general area earlier in the day, the officer became concerned that T.H. might have stashed a gun the other student's locker. (*Id.* at p. 713.) Two campus security officers eventually searched two lockers in that area. (*Ibid.*) J.D.'s backpack, which contained a sawed-off shotgun and miscellaneous papers, was in one of the lockers, and J.D. later admitted the shotgun belonged to him. (*Id.* at p. 714.)

The trial court denied J.D.'s motion to suppress, and J.D. appealed. Citing *Randy G.*, *supra*, 26 Cal.4th 556, the appellate court stated, "[a]gainst the strong governmental interest or special need in the public school arena, the courts have developed the need to focus not on individualized suspicion, but on the circumstances triggering administrative action and whether the execution is arbitrary, capricious, or for the purpose of harassment. [Citation.]" (*J.D.*, *supra*, 225 Cal.App.4th at p. 716.) In sum, "'[T]he legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search." (*Id.* at p. 717.)

In this case, Duggan, based on specific and articulable facts, was justified in searching Juan's locker for proof of vandalism. While doing so, he found notebooks belonging to Diego. Diego's notebooks were readily available to anyone who opened the locker, and Duggan merely picked up and opened them. The notebook was contraband, and as it turned out, also contained evidence of vandalism. In our view, Duggan acted reasonably when he searched the contents of Juan's locker, Diego's property included.

Diego's reliance on *William G.*, *supra*, 40 Cal.3d 550, and *In re Lisa G.* (2004) 125 Cal.App.4th 801 (*Lisa G.*), is misplaced. Neither case deals with the proposition that an individualized suspicion of wrongdoing must be formed when one student's property is found in the locker of another.

8

In *William G.,* an assistant principal, Lorenz, approached William because William was tardy and carrying a suspicious small black bag. (*William G*., *supra*, 40 Cal.3d at p. 555.) William was not cooperative when Lorenz asked to see inside the bag. (*Ibid.*) In fact, William told Lorenz to get a warrant. (*Ibid.*) Eventually, Lorenz took the bag from William and opened it, finding drugs and drug paraphernalia inside. (*Ibid.*)

In *Lisa G.*, a teacher opened the purse of a disruptive student after the student left the classroom to look for identification, but she found a knife. Citing *William G.*, the appellate court reversed the lower court's denial of Lisa's motion to suppress, concluding "A correlation between the wrongful behavior of the student and the intended findings of the search is essential for a valid search of the student under the Fourth Amendment." (*Lisa G*., *supra*, 125 Cal.App.4th at p. 807.)

We have no quarrel with either case, but they provide no guidance here. Duggan searched Juan's locker based on an objectively reasonable suspicion it would contain evidence of Juan's vandalism. Nothing more was required.

## DISPOSITION

The judgment is affirmed.


THOMPSON, J.

WE CONCUR:


O'LEARY, P. J.


ARONSON, J.